[Cite as *State v. Chamberlain*, 2014-Ohio-4619.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BROWN COUNTY

STATE OF OHIO,                              :

    Plaintiff-Appellee,                    :          CASE NO.  CA2013-04-004

    - vs -                              :          O P I N I O N
                                                10/20/2014

                                            :

LARRY CHAMBERLAIN,                          :

    Defendant-Appellant.                   :


CRIMINAL APPEAL FROM BROWN COUNTY COURT OF COMMON PLEAS
Case Nos. CRI 2011-2249, CRI 2011-2250, CRI 2012-2247


Jessica A. Little, Brown County Prosecuting Attorney, Mary McMullen, 510 East State Street, Suite 2, Georgetown, Ohio 45121, for plaintiff-appellee

Christine D. Tailer, P.O. Box 14, Georgetown, Ohio 45121, for defendant-appellant


**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Larry Chamberlain, appeals his convictions in the Brown County Court of Common Pleas for four counts of rape. For the reasons discussed below, we affirm his convictions.

{¶ 2} In November 2011, Chamberlain was indicted for five counts of rape. In September 2012, he was indicted on an additional count of rape and one count of complicity to gross sexual imposition. The alleged victim of all charged offenses was S.R., the 12-year-

old daughter of Chamberlain's girlfriend.  Chamberlain maintained that he was not guilty.

{¶ 3}  In February 2013, the state dismissed three of the seven charges against Chamberlain.  The case proceeded to a jury trial in March 2013 on four counts of rape: one each for anal intercourse, vaginal intercourse, fellatio, and cunnilingus with S.R.

{¶ 4}  The state established the following foundational facts at trial through the testimony of several employees of the school S.R. attended, the Brown County Department of Jobs and Family Services ("DJFS"), and the Ripley Police Department.  L.R. ("Mother"), the mother of S.R., shared an apartment with Chamberlain in Ripley, Ohio.  S.R. moved in with the couple in July 2011 after she was removed from her grandfather's care.  She was 12 years old at the time, and had an IQ of 54.  Tammy Leahy, the teacher who worked one-on-one with S.R. at school, stated that S.R. had a "Functional Mental Disability" which caused difficulty with, among other things, the sequencing of events.

{¶ 5}  On August 31, 2011, S.R. informed friends and a counselor at school that Chamberlain had touched her vagina.  The school immediately reported the allegation to DJFS.  Later that afternoon, DJFS investigator Sheri Tabor, accompanied by Ripley Police Chief Harvey Bowman, visited Mother and Chamberlain at their apartment.  Tabor advised the couple that DJFS had received a report that Chamberlain had molested S.R., and obtained Mother's permission to pick S.R. up from school and speak with her about the allegations.  Tabor took S.R. directly from school to a foster home.

{¶ 6}  Later that evening, S.R. was transported to Cincinnati Children's Hospital for a physical examination in connection with the allegations she made against Chamberlain.  Two days later, on September 2, 2011, she returned to Children's Hospital for a forensic interview with a social worker at the Mayerson Center for Safe and Healthy Children.  Thereafter, S.R. remained in foster care.

{¶ 7}  Mina Devine was the Pediatric Sexual Assault Nurse Examiner on duty at

Children's Hospital when S.R. was admitted for an examination on August 31, 2011. Devine testified that her examination revealed that S.R.'s hymen was "irregular shaped," and that there was a "line type abrasion on her clitoris" and "a slight redness towards her anal area." Devine also testified that she used a Sexual Assault Evidence Collection Kit ("rape kit") that was eventually sent through the Ripley Police Department to the Bureau of Criminal Investigation ("BCI").

{¶ 8} Dr. Stephanie Kennebeck, M.D., was the physician on duty at Children's Hospital when S.R. was admitted. Dr. Kennebeck testified that she examined S.R. at the same time as Devine, and that her examination revealed a "very jagged and irregular hymenal ring, which is the redundant skin left from the hymen when there's been penetration of the vagina." She also testified that S.R. had copious thin and brown discharge in her vaginal vault, and redness around her clitoris. Dr. Kennebeck stated that based on her findings, and because the hymnal ring "tends to heal very, very quickly," her opinion was that S.R.'s vagina had been penetrated within 72 hours of the examination.

{¶ 9} Cecilia Freihofer was the social worker who conducted the forensic interview with S.R. at the Mayerson Center on September 2, 2011. Freihofer testified that S.R. indicated to her that her mom's boyfriend touched her with his penis. She stated that S.R. used drawings to signify that Chamberlain had put his penis in her mouth, vagina, and "butt." According to Freihofer, S.R. said that Chamberlain:

> [H]ad put a condom on his penis that was hairy. That he first tried to put it in her front * * * but it didn't work, so he put it her [sic] butt. * * * She said that he wanted her to suck on his penis and that, "nasty stuff, that tasted like sour milk," came out of his penis and went down her throat.

{¶ 10} Sarah Glass was the first BCI evidence technician to work with the samples from S.R.'s rape kit. She testified that no semen was found on S.R.'s vaginal, anal, or oral swabs, but that amylase was present on S.R.'s breast swabs. According to Glass, amylase

is a component of saliva. She said that although it is also present in other bodily fluids, amylase is about a thousand times more concentrated in saliva.

{¶ 11} Emily Draper, a DNA analyst with BCI, then testified that her testing of the DNA from the amylase on S.R.'s breast swabs revealed two different DNA profiles. She stated that one of the DNA profiles was consistent with S.R., and that the other "could" have been from another person. Draper testified that the DNA profile from the other person was not developed enough for a comparison with other DNA samples.

{¶ 12} Next, Adam Garver, a forensic scientist with BCI, testified about the test he ran on the DNA from S.R.'s breast swab. He stated that the unknown DNA sample contained a partial Y chromosome DNA profile. Therefore he concluded, with reasonable scientific certainty, that the DNA was from a male human being. However, Garver, too, stated that the DNA profile was insufficient for comparison purposes.

{¶ 13} After the evidence was put on regarding the DNA testing, Mother testified as to her firsthand knowledge of Chamberlain's sexual encounters with S.R. Prior to trial, Mother had entered a plea deal with the state wherein in exchange for her truthful testimony against Chamberlain, the state would accept her guilty plea to one count of gross sexual imposition and drop five counts of complicity to rape she faced for her involvement in Chamberlain's encounters with S.R.. At trial, Mother's testimony reflected some initial reluctance to incriminate either Chamberlain or herself. However, after the trial court took a short recess to remind her that the plea deal she received would be withdrawn without her truthful testimony, Mother proved much more forthcoming.

{¶ 14} Mother testified to an encounter in which Chamberlain performed cunnilingus on S.R. in Mother's presence. She also recalled a time that she entered the apartment and found Chamberlain zipping up his pants while leaving S.R.'s room, followed by S.R. who was straightening up her pants. She remembered telling Chamberlain on that occasion that the

encounters had to stop or the state would take her kids away. Finally, Mother testified about the night that she passed out drunk and awoke to find S.R. face down on the bed with Chamberlain penetrating her from behind. Mother stated that S.R. came to her after this encounter with complaints of vaginal bleeding.

{¶ 15} The state then presented S.R.'s testimony via video deposition. On direct examination, S.R. was presented with an anatomically correct picture of a female and asked to identify the parts of her body that Chamberlain had touched. She indicated that Chamberlain touched her "bottom," vagina, nipples, and mouth. S.R. was then presented with an anatomically correct picture of a male, and asked to identify the parts of Chamberlain's body that he used to touch her. She indicated that his mouth touched her nipples and her vagina, and that his penis touched her bottom, vagina, and mouth. She further testified that his penis went "all the way up" her vagina and "inside" her mouth and bottom, and that his mouth was "pretty much on the outside and the inside sometimes [of her vagina], but it was pretty much both."

{¶ 16} On cross-examination, S.R. was not able to give a coherent account of when or in what order her sexual encounters with Chamberlain occurred, but she did provide detailed descriptions of what transpired during the encounters. S.R. testified about an occasion when Mother was away at the store and Chamberlain had her lie down on his bed, and "[h]e put his thing inside of my bottom, and my front, and in my mouth" but stopped when he heard Mother come home. S.R. stated that Chamberlain did not have a condom on during this encounter, and noted that afterwards she went to the bathroom and found blood and "yellow stuff" when she wiped. She said that he usually used a condom.

{¶ 17} S.R. also testified about another occasion that Mother was at the store. On this occasion, Chamberlain and S.R. were playing cards on the floor, when Chamberlain took his pants off, stood up, and put his penis in her mouth. S.R. stated that when she tried to pull

her head away, he pinched her hand and put both of his hands on her neck to keep her head still. When asked if Chamberlain had done this before, S.R. responded that he had, but that she didn't know how many times.

{¶ 18} Finally, S.R. testified about "the last time" she had intercourse with Chamberlain, an occasion preceded by a "weird" card game with Chamberlain and Mother in which people "take off their pants and their clothes * * * and then everything else." S.R. recalled that after the game, Mother left the room to cook dinner. S.R. stated that when Mother returned to the room, Chamberlain's "thing was in mine, and then he was * * * on top of me. * * * When he was putting it in me he was like licking my nipples." S.R. testified that this made Mother angry, and that when S.R. awoke the next morning Mother threatened to disown her. According to S.R., this was the morning that she disclosed her encounters with Chamberlain to her friends at school.

{¶ 19} In his defense, Chamberlain called only one witness, Diana Walker. Walker is Mother's aunt and S.R.'s great aunt. She testified that she stopped to visit S.R. and Mother at the apartment in Ripley three or four times a week, and that she was never given reason to believe anything was amiss. She stated that she would always ask S.R. how she was being treated, and that S.R. would always respond Chamberlain and Mother were being good to her. Additionally, Walker noted that her mother, Mother's grandmother and S.R.'s great grandmother, stayed at the Ripley apartment for nearly a week and did not report anything "untoward." Lastly, Walker testified that Mother had a reputation for being "slower" than the others, and that she hardly ever told the truth.

{¶ 20} The jury returned a guilty verdict on all four counts, and Chamberlain was sentenced to three consecutive terms of life imprisonment, and a fourth term of life imprisonment to run concurrently. Chamberlain now appeals, raising five assignments of error. For ease of discussion, we address the assignments of error out of order.

{¶ 21} Assignment of Error No. 4:

{¶ 22} THE TRIAL COURT ERRED IN ALLOWING DR. KENNEBECK TO TESTIFY AS AN EXPERT IN "CHILD SEXUAL ABUSE."

{¶ 23} In his fourth assignment of error, Chamberlain claims the trial court erred by allowing Dr. Kennebeck to testify as an "Expert in Child Sexual Abuse." He notes that Dr. Kennebeck admitted she had not conducted any research or published in the area of sexual abuse, and that she was only an examiner. As such, Chamberlain asserts Dr. Kennebeck was not qualified to render the opinion that S.R. evidenced physical findings consistent with "sexual assault" within the past 72 hours.

{¶ 24} At the outset, we note that Chamberlain's argument on appeal mischaracterizes the trial court's findings with respect to Dr. Kennebeck. Although the state did proffer her as an "expert in child sexual abuse," after Chamberlain's objection the trial court limited its ruling to a finding that Dr. Kennebeck was an expert in the respective fields of general pediatric medicine and pediatric emergency medicine. This ruling was sufficient to qualify Dr. Kennebeck to testify as to her expert opinion of S.R.'s physical condition at the time of her examination at Children's Hospital.

{¶ 25} "'The qualification of an expert is a matter for determination by the [trial] court on the facts, and rulings with respect to such matters will ordinarily not be reversed unless there is a clear showing that the court abused its discretion.'" *State v. Mack*, 73 Ohio St.3d 502, 511 (1995), quoting *State v. Maupin*, 42 Ohio St.2d 473, 479 (1975). Evid.R. 702 provides that a witness may testify as an expert if she can assist the trier of fact in the search for truth, and all of the following apply:

> (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
>
> (B) The witness is qualified as an expert by specialized

knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

(C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *

*See also State v. Cartwright*, 12th Dist. Preble No. CA2012-03-003, 2013-Ohio-2156, ¶ 33-34. The qualifications which may satisfy these requirements are "multitudinous." *Mack* at 511.

{¶ 26} Dr. Kennebeck testified that she went to medical school at Northwestern University Medical School, and graduated in 1996. She completed her residency in pediatrics at Baylor College of Medicine in 1999, and a fellowship in pediatric emergency medicine in 2002. The fellowship in pediatric emergency medicine included training in pediatric child and sexual abuse. She is certified with the American Board of Pediatrics in general pediatrics, and she is "sub-boarded" in pediatric emergency medicine. Because the Board's curriculum in pediatric emergency medicine requires training in sexual abuse, Dr. Kennebeck's certification required her to perform numerous exams, under the tutelage of a certified expert, on children alleged to be victims of sexual abuse.

{¶ 27} Dr. Kennebeck is currently employed in the Division of Emergency Medicine at Cincinnati Children's Hospital, a position she has held for the past ten years. In that position, she works between 50 and 60 hours per week, splitting her time between clinical duties in the Emergency Department and academic duties with the Division of Emergency Medicine. During her tenure at Children's Hospital, she estimates that she has performed hundreds of exams on children suspected of being sexually abused.

{¶ 28} Chamberlain conducted a voir dire, during which Dr. Kennebeck acknowledged there is a specialty for pediatric sexual abuse medicine, and that she has not been certified in that specialty. She also acknowledged that she has not participated as a researcher or a primary investigator in any of the current academic studies on child sexual abuse. Yet Dr.

Kennebeck noted that there are very few practitioners in the area of pediatric sexual abuse medicine around the country, and that as part of her job she stays up to date on the literature regarding pediatric abuse. Though she has not published on the academic side, Dr. Kennebeck testified that she does consider the examination of children suspected to be victims of sexual abuse to be one of her specialties.

{¶ 29} We find the trial court did not abuse its discretion by finding Dr. Kennebeck's ten years of professional experience and extensive training were sufficient to qualify her as an expert in the areas of general pediatrics and pediatric emergency medicine. We further find that her training and experience, and her direct physical examination of S.R., qualified her to provide an opinion as to whether S.R.'s physical condition was consistent with her allegations against Chamberlain. *See Mack*, 73 Ohio St.3d at 511.

{¶ 30} Chamberlain's fourth assignment of error is overruled.

{¶ 31} Assignment of Error No. 5:

{¶ 32} THE TRIAL COURT ERRED IN ITS APPLICATION OF R.C. 2907.02(D), OHIO'S RAPE SHIELD LAW.

{¶ 33} In his fifth assignment of error, Chamberlain argues that the trial court erred in applying R.C. 2907.02(D), Ohio's rape shield law, to exclude evidence that S.R. was sexually abused by someone else before she came to live in his apartment. Specifically, Chamberlain equates the condition of a torn hymen with having a disease, and asserts that because the state's evidence of S.R.'s torn hymen implies that it was torn during vaginal intercourse with him, the rape shield law would allow him to introduce evidence pointing toward a preexisting tear.

{¶ 34} Prior to S.R. taking the stand, the trial court heard argument about Chamberlain's proposed line of questioning regarding the sexual abuse that S.R. suffered prior to living with Chamberlain. Chamberlain proffered that while S.R. was living with her

- 9 -

grandfather in Kentucky, Mother's ex-boyfriend was prosecuted and found guilty in a Kentucky court of sexually abusing S.R., and that during her interview with Freihofer, S.R. stated the ex-boyfriend had abused her between 20 and 25 times. Chamberlain argued that this was probative evidence because it raised the possibility that S.R.'s hymen was torn by the earlier abuse. However, Chamberlain did not offer any medical evidence to support his theory.

{¶ 35} The rape shield statute provides, in pertinent part, that "[e]vidence of specific instances of the victim's sexual activity * * * shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, or the victim's past sexual activity with the offender * * *." R.C. 2907.02(D). If the trial court finds that the evidence falls within one of the law's enumerated exceptions, then the court must further determine whether the probative value of the evidence outweighs its prejudicial nature. *State v. Guthrie*, 86 Ohio App.3d 465, 467 (12th Dist.1993), citing *State v. Leslie*, 14 Ohio App.3d 343, 346 (2nd Dist.1984). In making this determination, the trial court must "'balance the state interest which the statute is designed to protect against the probative value of the excluded evidence.'" *State v. N.D.C.*, 10th Dist. Franklin No. 06AP-790, 2007-Ohio-5088, ¶ 22, quoting *State v. Gardner*, 59 Ohio St.2d 14, 17 (1979). The ultimate decision to admit or exclude the evidence is within the trial court's sound discretion. *State v. Ashcraft*, 12th Dist. No. CA97-11-217, 1998 WL 667657, *2 (Sept. 28, 1998), citing *Guthrie* at 467.

{¶ 36} Despite Chamberlain's argument to the contrary, a torn hymen is not the equivalent of, or even analogous to, a disease. *See State v. Trent*, 5th Dist. Licking No. 05CA101, 2006-Ohio-3132, ¶ 13. As the Third Appellate District has noted:

> [Whereas] [d]isease is defined as "* * * a pathological condition of the body that presents a group of symptoms peculiar to it and which sets the condition apart as an abnormal entity * * * an "injury" is described as "[t]rauma or damage to some part of the body."

*State v. Little*, 3d Dist. Seneca No. 13-01-40, 2002-Ohio-5094, ¶ 10, quoting *Taber's Cyclopedic Medical Dictionary* 415, 730 (14th Ed.1981). A torn hymen would seem to fit the definition of "injury," as opposed to "disease." *Little* at ¶ 10 (noting that no case law espousing the contrary view could be found).

{¶ 37} Perhaps more to the point, even if the trial court had found that a torn hymen falls under the "disease" exception to the rape shield law, Chamberlain's proffered evidence was of little probative value. To begin with, Chamberlain proffered no medical evidence supporting his theory that prior sexual abuse could be the source of S.R.'s torn hymen, while the state's medical expert testified that the hymen was likely torn during vaginal penetration that occurred within 72 hours of the exam. *See Ashcraft* at *3 (finding no abuse of discretion in excluding evidence of prior sexual abuse where the appellant failed to present medical evidence regarding the irregularity in the victim's hymen). Moreover, the state's evidence regarding the torn hymen was offered to support the occurrence of recent vaginal penetration, not to disclose the identity of the perpetrator.

{¶ 38} Therefore, we find that the trial court did not abuse its discretion by excluding, under the rape shield law, evidence that S.R. suffered sexual abuse prior to living with Chamberlain. Chamberlain's fifth assignment of error is overruled.

{¶ 39} Assignment of Error No. 1:

{¶ 40} APPELLANT WAS NOT AFFORDED THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL.

{¶ 41} In his first assignment of error, Chamberlain argues that his trial counsel committed so many errors that her representation, taken as a whole, constituted ineffective assistance of counsel. Specifically, Chamberlain asserts that his counsel (1) helped the state make its case by bringing forth more damaging facts on cross-examination than were elicited

- 11 -

during the state's direct examination, (2) failed to object to improper hearsay testimony and improper expert testimony, and (3) failed to make proper use of rape shield exceptions to impeach S.R.'s testimony. Chamberlain claims the combined effect of these errors was so serious as to deprive him of a fair trial.

{¶ 42} To prevail on an ineffective assistance of counsel claim, an appellant must satisfy the two-prong *Strickland* test. *State v. Bradley*, 42 Ohio St.3d 136, 141-42 (1989), citing *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052 (1984). He must establish both that his trial counsel's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced him to the point of depriving him of a fair trial. *State v. Setty*, 12th Dist. Clermont No. CA2013-06-049 and -050, 2014-Ohio-2340, ¶ 58, citing *Strickland* at 688. A reviewing court may approach a *Strickland* analysis starting with either prong of the test, and an appellant's failure to satisfy one prong of the test negates the court's need to consider the other. *Bradley* at 143, citing *Strickland* at 697.

### 1. Cross-examination of the State's Witnesses

{¶ 43} Chamberlain cites four separate instances in which defense counsel's cross-examination of a witness elicited facts that Chamberlain considers to be more damaging than those elicited during the state's examination. First, he notes that Sheri Tabor, an investigator with DJFS, had only testified on direct that she had responded to a report of abuse, but that questioning on cross-examination led her to reveal S.R. had pointed to her vagina and stated Chamberlain "put his thing in her." Second, he claims that but for the cross-examination of Freihofer, the forensic interviewer at the Mayerson Center, the jury would not have been exposed to a story S.R. told Freihofer about the sexual encounter that occurred when Chamberlain sent Mother to the store because he did not have a "square packet" (i.e., a condom). Third, Chamberlain notes that it was only on cross-examination that Dr.

Kennebeck testified with regard to the redness of S.R.'s clitoris, the abrasion on S.R.'s hymen, and a notation in the medical records about a scratch on S.R.'s buttocks. Finally, Chamberlain points out that all of S.R.'s graphic testimony about the alleged sexual encounters was elicited on cross-examination.

{¶ 44} "The scope of cross-examination falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Additionally, in evaluating trial counsel's performance, the reviewing court must indulge a strong presumption that counsel rendered adequate assistance and exercised reasonable professional judgment. *Id.* at ¶ 101, citing *Strickland* at 689. *See also Setty*, 2014-Ohio-2340 at ¶ 60.

{¶ 45} In the present case, the strategy employed by Chamberlain's trial counsel was to attempt to create reasonable doubt by drawing out the inconsistencies in the evidence regarding S.R.'s alleged sexual encounters with Chamberlain. Counsel questioned Tabor, the DJFS investigator, more pointedly about S.R.'s initial statement regarding Chamberlain because counsel was trying to demonstrate that, at the outset of the investigation, S.R.'s allegations were merely that Chamberlain touched her. Counsel further questioned Freihofer about the forensic interview at the Mayerson Center because she was trying to show both internal inconsistencies in the story S.R. told to Freihofer, and inconsistencies between the account to Freihofer and S.R.'s testimony at trial. Counsel sought detailed information from Dr. Kennebeck because there was an apparent inconsistency between observations about S.R. that Dr. Kennebeck recorded in her medical chart, and observations recorded by the examining doctor on the next shift. Finally, counsel went so deeply into the graphic details in her cross-examination of S.R. because she was attempting to show both that S.R. was confused, and that her story was inconsistent.

{¶ 46} Under the circumstances, defense counsel's strategy was reasonable. *See*

*State v. Smallwood*, 12th Dist. Butler No. CA95-12-209, 1996 WL 586772, *3 (Oct. 14, 1996) (noting trial counsel's decisions on cross-examination are presumed to be the product of sound trial strategy).

### 2. Failure to Object to Improper Testimony

{¶ 47} Chamberlain believes that his trial counsel was ineffective for failing to object to Ripley Police Chief Harvey Bowman's hearsay testimony and to the opinion testimony of BCI analyst, Emily Draper. He asserts his counsel should have raised a hearsay objection when Chief Bowman testified to the content of what S.R. told the school principal and Tabor, and when Chief Bowman testified as to Chamberlain's alleged state of mind when he and Tabor visited Chamberlain's apartment. Additionally, Chamberlain claims that his counsel should have objected to Draper's testimony as contrary to Evid.R. 702(C) because she testified that the DNA from the amylase on S.R.'s breast swab "could" be from another person.

{¶ 48} "Failure to make objections does not automatically constitute ineffective assistance of counsel * * *." *State v. Homer*, 12th Dist. Warren No. CA2003-12-117, 2006-Ohio-1432, ¶ 15, citing *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, ¶ 168. Even if we were to agree with Chamberlain that an objection may have been successful based on the inadmissibility of either Chief Bowman's or Draper's testimony, we cannot say that trial counsel's failure to object was anything more than trial strategy. *State v. Boeddeker*, 12th Dist. Clermont No. CA2009-05-029, 2010-Ohio-106, ¶ 18. Chamberlain's counsel may have believed that an objection to Chief Bowman's testimony would have unduly focused the jury's attention on the information, or that an objection was not worth the risk of antagonizing the jury. *Homer* at ¶ 15; *Boeddeker* at ¶ 20. She may also have believed that objecting to Draper's testimony would have provoked the state, either on re-direct of Draper or with its other BCI expert witnesses, to seek elaboration on the results of the DNA testing to bolster its

case. *See State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, ¶ 83.

{¶ 49} Further, even assuming arguendo that counsel was ineffective, Chamberlain has not clearly demonstrated that his counsel's failure to object resulted in prejudice in either instance. *Homer* at ¶ 15; *Boeddeker* at ¶ 21-22. To show prejudice, the appellant must demonstrate a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. With respect to both Chief Bowman and Draper, the testimony in question was redundant. Chief Bowman's hearsay testimony was largely consistent with testimony that had already been given by Tabor, and was later repeated by staff members at S.R.'s school. As to the DNA evidence, in subsequent testimony Draper affirmed that she could state with reasonable scientific certainty that the DNA was from another human being. Moreover, her testimony was consistent with the expert testimony of forensic scientist Adam Garver, whose analysis of S.R.'s breast swab revealed that the unknown DNA profile came from a male human being.

### 3. Impeachment of S.R.

{¶ 50} Finally, Chamberlain argues that his trial counsel did not make effective use of rape shield exceptions to impeach S.R. He notes that the trial court had ruled to allow the use of (1) a statement by S.R.'s grandfather that S.R. is not always truthful, (2) a report from 2007 that S.R. had made unsubstantiated allegations of sexual abuse against her grandfather, (3) a report from 2008 that S.R. had made unsubstantiated allegations of sexual contact between her and her brother, and (4) S.R.'s history of lying. Chamberlain argues that the use of this evidence would have "clearly benefitted" his case.

{¶ 51} Whether or not the presentation of certain evidence would have "clearly benefitted" an appellant's case is not the standard for discerning whether appellant was prejudiced by the ineffective assistance of trial counsel. As noted above, to show prejudice an appellant must demonstrate a reasonable probability that, but for counsel's errors, the

result of the proceeding would have been different. *Strickland* at 694. Chamberlain has not met this burden. S.R.'s claims were corroborated by Mother's testimony, the rape kit analysis by BCI scientists, the testimony of medical personnel who examined S.R. in the hours immediately following S.R.'s last sexual encounter with Chamberlain, and the testimony of the social worker who conducted a forensic interview with S.R. two days after her medical examination.

{¶ 52} Moreover, decisions about what evidence to present and which witnesses to call are committed to trial counsel's professional judgment. *State v. Williams*, 99 Ohio St.3d 493, 2003-Ohio-4396, ¶ 127, citing *State v. Keith*, 79 Ohio St.3d 514, 530 (1997). Here, Chamberlain's counsel made the deliberate decision not to pursue a strategy of impugning S.R.'s character, but to focus instead on drawing out the inconsistencies in her story. This was not an unreasonable trial strategy.

{¶ 53} Chamberlain's first assignment of error is overruled.

{¶ 54} Assignment of Error No. 2:

{¶ 55} APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 56} Chamberlain argues in his second assignment of error that the evidence offered against him, if viewed objectively, weighs heavily in favor of his acquittal. He asserts that S.R.'s cognitive impairment led to an account of the alleged sexual encounters that was confused and disjointed, and that the other testimony offered against him was highly contradictory. He therefore contends that the jury's verdict was determined by the graphic nature of the evidence, not its weight.

{¶ 57} A manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.

*State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 35, citing, *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).  To determine whether a conviction is against the manifest weight of the evidence, the appellate court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.  *Setty*, 2014-Ohio-2340 at ¶ 83.

{¶ 58} In conducting its review, the appellate court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence.  *State v. Kilbarger*, 12th Dist. Fayette No. CA2013-04-013, 2014-Ohio-2341, ¶ 7, citing *State v. Bailey*, 12th Dist. Butler No. CA2002-03-057, 2003-Ohio-5280, ¶ 22.  Indeed, Section 3(B)(3) of Article IV of the Ohio Constitution provides that no judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of all three appellate judges hearing the cause.  "It is obvious that one of the underlying purposes of [this provision] is to preserve the jury's role with respect to issues surrounding the credibility of witnesses."  *Thompkins*, 78 Ohio St.3d at 389.

{¶ 59} Chamberlain was convicted of four counts of rape in violation of R.C. 2907.02(A)(1)(b), which provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age * * *."  "Sexual conduct" is defined as:

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex * * *.  Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A).

{¶ 60} After reviewing the entire record, weighing inferences, and examining the

credibility of witnesses, we find that Chamberlain's convictions for rape were not against the manifest weight of the evidence. In her testimony, S.R. demonstrated an adult knowledge of sexual activity, and described all elements of vaginal intercourse, anal intercourse, fellatio, and cunnilingus in striking detail. S.R.'s testimony with respect to vaginal intercourse, anal intercourse, and cunnilingus is corroborated by Mother's testimony regarding her firsthand knowledge of S.R.'s encounters with Chamberlain.

{¶ 61} Moreover, S.R.'s testimony with respect to vaginal intercourse is also directly corroborated by Dr. Kennebeck's opinion that S.R.'s vagina had been penetrated within 72 hours of her examination, and Devine's testimony that S.R. had an "irregular shaped" hymen. S.R.'s testimony regarding anal intercourse and fellatio is consistent with the information she provided to Freihofer during her forensic interview at the Mayerson Center. And S.R.'s account of the last sexual encounter with Chamberlain, during which "he was putting it in me [and] was like licking my nipples," is consistent with BCI's findings of amylase from a male human being on one of S.R.'s breast swabs.

{¶ 62} Hence, while it is true that the evidence was graphic and S.R.'s testimony was confused at points, the state presented corroborating testimony, as well as medical and scientific evidence, that amply support the jury's determination of Chamberlain's guilt. "It is well-established that when 'conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony.'" *State v. Williams*, 12th Dist. Warren No. CA2012-08-080, 2013-Ohio-3410, ¶ 35, quoting *State v. Guzzo*, 12th Dist. Butler No. CA2003-09-232, 2004-Ohio-4979, ¶ 13.

{¶ 63} Chamberlain's second assignment of error is overruled.

{¶ 64} Assignment of Error No. 3:

{¶ 65} THE TRIAL COURT ERRED AS A MATTER OF LAW IN NOT MEGING [SIC]

TOGETHER THE FOUR RAPE CHARGES, AS ALLIED OFFENSES OF SIMILAR IMPORT, BASED ON THE ACTUAL TRIAL EVIDENCE.

{¶ 66} In his third assignment of error, Chamberlain argues the four rape counts should have been merged as allied offenses of similar import. He asserts that the single act of engaging in sex, flowing from cunnilingus, to fellatio, to vaginal intercourse, to anal intercourse, would not amount to different encounters, but only "a single act performed with a single state of mind."

{¶ 67} Chamberlain never raised the issue of merger to the trial court. Therefore, this court will review Chamberlain's allied offenses argument for plain error. *State v. Pearce*, 12th Dist. Clermont No. CA2013-01-001, 2013-Ohio-3484, ¶ 14. An alleged error is plain error only if it is obvious, and "'but for the error, the outcome of the trial clearly would have been otherwise.'" *State v. Calhoun*, 12th Dist. Fayette No. CA2013-05-014, 2014-Ohio-3662, ¶ 28, quoting *State v. Blake*, 12th Dist. Butler No. CA2011-07-130, 2012-Ohio-3124, ¶ 25.

{¶ 68} R.C. 2941.25, the statute governing allied offenses of similar import, provides:

> (A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.
>
> (B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

In other words, the statute "prohibits the imposition of multiple punishments for the same criminal conduct." *State v. Ozevin*, 12th Dist. Clermont No. CA2012-06-044, 2013-Ohio-1386, ¶ 9.

{¶ 69} In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Ohio Supreme

Court outlined a two-part test for identifying allied offenses of similar import under R.C. 2941.25. The first part requires the reviewing court to ask whether it is possible to commit the offenses at issue with the same conduct. *Johnson* at ¶ 48. The court should not ask whether committing one offense *would always* result in the commission of the other, but simply whether it *could* result in the commission of the other. *Id.*

{¶ 70} If the first part is answered in the affirmative, the reviewing court must proceed to the second part of the test and ask whether the offenses were *actually* committed by the same conduct; "i.e., a single act, committed with a single state of mind." *State v. Smith*, 12th Dist. Clermont No. CA2012-01-004, 2012-Ohio-4523, ¶ 13, citing *Johnson* at ¶ 49. If both parts of the test are answered in the affirmative, the offenses must be merged as allied offenses of similar import under R.C. 2941.25(A). *Smith* at ¶ 13, citing *Johnson* at ¶ 50. However, if "the commission of one offense [would] never result in the commission of the other, or if the offenses [were] committed separately, or if the defendant [had] a separate animus for each offense, then * * * the offenses will not merge." *Johnson* at ¶ 51.

{¶ 71} In the present case, the jury found that Chamberlain engaged in fellatio, cunnilingus, vaginal intercourse, and anal intercourse with S.R.. It is well-established that distinct, different kinds of sexual activity constitute separate offenses for sentencing purposes. *State v. Accorinti*, 12th Dist. Butler No. CA2012-10-205 and CA2012-11-221, 2013-Ohio-4429, ¶ 14-16, citing *State v. Daniels*, 9th Dist. Summit No. 26406, 2013-Ohio-358, ¶ 9 (involving digital penetration of the vagina, fellatio, and vaginal intercourse). *See also State v. Hernandez*, 12th Dist. Warren No. CA2010-10-098, 2011-Ohio-3765, ¶ 48-50 (involving vaginal intercourse, cunnilingus, and anal intercourse). "Each act is a further denigration of the victim's integrity and a further danger to the victim." *State v. Barnes*, 68 Ohio St.2d 13, 19 (1981) (Celebrezze, C.J., concurring).

{¶ 72} Because Chamberlain's four rape offenses involved distinct sexual acts, the trial court did not commit plain error by failing to merge the offenses for sentencing. Chamberlain's third assignment of error is overruled.

{¶ 73} Judgment affirmed.

S. POWELL and M. POWELL, JJ., concur.