**[Cite as *State v. McLoughlin*, 2018-Ohio-2426.]**

### IN THE COURT OF APPEALS OF OHIO
### SECOND APPELLATE DISTRICT
### CHAMPAIGN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2017-CA-22 |
| | : | |
| v. | : | Trial Court Case No. 2016-CR-22 |
| | : | |
| JONATHAN P. MCLOUGHLIN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 22nd day of June, 2018.

. . . . . . . . . .

JANE A. NAPIER, Atty. Reg. No. 0061426, Champaign County Prosecutor's Office, Appellate Division, 200 N. Main Street, Urbana, Ohio 43078
    Attorney for Plaintiff-Appellee

REGINA R. RICHARDS, Atty. Reg. No. 0079457, 4 W. Main Street, Suite 707, Springfield, Ohio 45502
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

**{¶ 1}** Jonathan Patrick McLoughlin was found guilty by a jury in the Champaign County Court of Common Pleas of six counts of unlawful sexual conduct with a minor and one count of attempted unlawful sexual conduct with a minor. Each count contained enhancements related to the age difference between McLoughlin and the victim (more than ten years) and McLoughlin's prior conviction for the same offense. McLoughlin was sentenced to a lengthy prison term and designated as a Tier III sex offender. He appeals from his convictions. For the following reasons, the judgment of the trial court will be affirmed.

### *Procedural History*

**{¶ 2}** On January 23, 2017, McLoughlin was charged by complaint with 3 offenses of unlawful sexual conduct with a minor in the Champaign County Municipal Court. On February 2, 2017, McLoughlin was indicted on seven counts of unlawful sexual conduct with a minor, in violation of R.C. 2907.04(A). Each count also contained enhancements that McLoughlin was ten or more years older than the victim and had previously been convicted of unlawful sexual conduct with a minor, R.C. 2907.04(B)(3-4). Each count also contained a specification that McLoughlin had a previous felony conviction (robbery).

**{¶ 3}** The matter was tried to a jury on June 26 and 27, 2017. At trial, the State moved to amend Count Seven from unlawful sexual conduct with a minor to attempted unlawful sexual conduct with a minor, and the trial court allowed this amendment without objection. The jury found McLoughlin guilty on all seven counts. The trial court sentenced McLoughlin to mandatory terms of 8 years on Count One and six years each on Counts Two through Six, to be served consecutively. The court also sentenced

McLoughlin to a non-mandatory term of 24 months on Count Seven, to be served concurrently with the other sentences. His aggregate term of imprisonment was 38 years. McLoughlin was designated a Tier III sex offender and was ordered to pay court costs and legal fees and expenses.

{¶ 4} On appeal, McLoughlin raises four assignments of error.

### Sufficiency and Weight of the Evidence

{¶ 5} In his first and second assignments of error, McLoughlin contends that his convictions were supported by insufficient evidence and were against the manifest weight of the evidence. Specifically, he claims that there was no evidence that he knew of the victim's age prior to engaging in sexual conduct with her or acted recklessly in that regard, that the timeframe for the offenses contained in the indictment did not conform to the evidence, and that the overly-broad timeframe in the indictment confused the jurors and prejudiced the defense.

{¶ 6} An argument based on the sufficiency of the evidence challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins,* 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492

(1991), paragraph two of the syllabus.

{¶ 7} In contrast, when reviewing an argument challenging the weight of the evidence, " '[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.' " *Thompkins* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 8} Where an appellate court determines that a conviction is not against the manifest weight of the evidence, the conviction is necessarily based on legally sufficient evidence. *State v. Million,* 2d Dist. Montgomery No. 24744, 2012-Ohio-1774, ¶ 23; *State v. Combs,* 2d Dist. Montgomery No. 19853, 2004-Ohio-2419, ¶ 12.

{¶ 9} The offense of unlawful sexual conduct with a minor is defined as follows:

No person who is eighteen years of age or older shall engage in sexual conduct with another, who is not the spouse of the offender, when the offender knows the other person is thirteen years of age or older but less than sixteen years of age, or the offender is reckless in that regard.

R.C. 2907.04(A). Sexual conduct is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C.

2907.01(A).

{¶ 10} "A person has knowledge of circumstances when the person is aware that such circumstances probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact." R.C. 2901.22(B). A person acts recklessly with respect to circumstances when, "with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that such circumstances are likely to exist." R.C. 2901.22(C).

{¶ 11} The indictment alleged that the offenses occurred between December 1, 2016 and January 20, 2017.

{¶ 12} The State called five witnesses at trial; the defense did not call any witnesses.

{¶ 13} Sergeant Shawn Schmidt testified that he was dispatched to the upstairs apartment of a house in Urbana on January 20, 2017, in response to an anonymous report that there was a juvenile in the upstairs unit with a sex offender. The caller allegedly heard noises coming from the bedroom and was concerned about the juvenile's safety. When Sgt. Schmidt and his partner knocked on the apartment door, they got no answer for approximately eight minutes, although they could hear noises inside the apartment. The door was then opened by a woman in a robe with a towel on her head (T.C.), who was accompanied by her daughter (M.). The woman explained that she did not allow her daughter to open the door when she (T.C.) was showering. Schmidt testified that it did not look like T.C.'s hair was wet.

**{¶ 14}** Schmidt asked T.C. "if there was any kind of domestic going on or disturbance within the residence." T.C. denied that there was any kind of domestic disturbance within the apartment, but she consented to a search. T.C. told Schmidt that she and her daughter, two other small children, and a man, Daniel, who was in one of the bedrooms, were the only people present.[1] Schmidt asked T.C. if there was a rear exit to the apartment, and T.C. directed him to a stairwell at the rear of the building. When Schmidt walked down the stairs, he found a man, McLoughlin, "hiding behind a water heater" in the unfinished basement.

**{¶ 15}** McLoughlin told Sgt. Schmidt that he was T.C.'s fiancé and had been visiting her. When asked why he had been hiding in the basement, McLoughlin stated that he was on probation in another county and had been drinking, which he was not supposed to do. During the course of his investigation, Schmidt learned through the Law Enforcement Automated Database (LEADS) that McLoughlin had a prior conviction for unlawful sexual conduct with a minor. The prior conviction was further substantiated at trial by a parole officer and the Clerk of Courts of Union County (Ohio), who presented and authenticated a certified copy of McLoughlin's prior conviction.

**{¶ 16}** M. testified that she was the oldest child in her family. In December 2016 and January 2017, M. was 14 years old and was living with her grandmother and one of her (M.'s) sisters in St. Paris, Ohio, while her other siblings were living with her mother, T.C., in Urbana. M. visited her mother's apartment on many weekends because she wanted to see her siblings.

---

[1] The evidence later revealed that Daniel's girlfriend was the person who called the police, at Daniel's urging, because he was concerned about M. but did not want to be directly involved.

**{¶ 17}** M. first met McLoughlin in December 2016. McLoughlin was T.C.'s boyfriend. M. soon suspected that McLoughlin liked her (M.) "as more than maybe just a friend," because he kissed her with an open mouth using his tongue. M. testified that her mother, T.C., also told her that McLoughlin liked her as more than a friend, and "said it was okay that that kind of stuff happened." M. stated that she was "shocked" when McLoughlin kissed her, but did not say anything to him about it.

**{¶ 18}** M.'s next physical contact with McLoughlin was at night when everyone else was asleep. M. was watching television on the couch in a common area. She testified that she was wearing one-piece "footie pajamas" depicting Eeyore from Winnie the Pooh, with a hood and a zipper down the front; she wore underwear and a bra underneath. McLoughlin came into the living room and starting kissing her without saying anything. He then laid her down on the couch on her back, unzipped the pajamas and took them off, pulled down her underwear, pushed her bra up, and "put his penis in [her] vagina." M. "just stayed quiet" and did not yell or scream. She stated that McLoughlin did not "wear any protection" and that he ejaculated inside her. When McLoughlin "got off of" her, she took her clothes to the bathroom to get dressed and went into her sister's room. M. went back to her grandmother's the next day.

**{¶ 19}** M. subsequently talked with T.C. about the incident through text messages. T.C. told M. that she was not "mad" at M., and M. expressed concern that she might be pregnant. According to M., T.C. "said she was going to get her [M.] the day-after pill. But she never did," and it turned out that M. was not pregnant.

**{¶ 20}** M. testified that, after she told her mom that she was not pregnant, T.C. would "talk to [M.] about [possibly getting together with McLoughlin again] over text

messages kind of like casually." M. "wasn't okay with it," but she "knew [her] mom was happy" and wanted to make her happy.

{¶ 21} M.'s second sexual encounter with McLoughlin occurred in T.C.'s bedroom, with T.C. present, at night when everyone else in the house was asleep. M. testified that McLoughlin put his penis in her vagina, without protection, but did not ejaculate inside her; M. believed that he had ejaculated "in [her] mom." McLoughlin also put his tongue on M.'s vagina, and put his penis in M.'s mouth.

{¶ 22} A third incident also occurred at night in T.C.'s bedroom and with T.C. and McLoughlin present. Again, McLoughlin put his penis in M.'s vagina and put his tongue on her vagina. McLoughlin asked M. to perform oral sex on him, but she said that she did not want to, and McLoughlin "was okay with that." He did not ejaculate or wear protection during the vaginal sex with M.; M. believed that he ejaculated when he had sex with her mother, because "[m]y mom was trying to get pregnant at the time."

{¶ 23} After the third incident, M. told T.C. that she "wanted to be done with it,'" and T.C. agreed.

{¶ 24} M. testified that she would sometimes talk with McLoughlin about her day or about school, and he knew she was in the eighth grade. With respect to the timing of the incidents, she testified that the first incident occurred after Thanksgiving on a Saturday in 2016, that the second incident occurred on another Saturday before her Christmas break from school began, and that the third incident occurred over her Christmas break.

{¶ 25} T.C. testified that she began dating McLoughlin in November 2016 and that he moved in with her and her younger children. T.C.'s two older children, including M., lived with T.C.'s mother, but M. came to visit T.C. most weekends. According to T.C.,

McLoughlin was "wonderful" to her children and got along well with M. She testified that McLoughlin was aware of how old her children were because she told him.

**{¶ 26}** T.C. testified that McLoughlin expressed "a sexual interest" in M., and T.C. "was pretty okay with it"; she "didn't oppose." However, T.C. imposed "conditions" that "for anytime we were with another person, * * * [McLoughlin] wasn't to ejaculate into someone else, that [she, T.C.] was to be involved, or he [McLoughlin] was to be involved." These conditions were not specifically related to M., and there were no additional conditions related to M.

**{¶ 27}** On the night of McLoughlin's first sexual intercourse with M., T.C. had fallen asleep in the bedroom while McLoughlin went to watch a movie with M. McLoughlin later woke T.C. up to tell her that he had "had sex with [M]." T.C. became upset, but her anger focused primarily on whether McLoughlin had ejaculated inside M.; "I knew when he didn't answer me, that he had." T.C. was upset about McLoughlin's ejaculation because she did not want M. to get pregnant and because "that was part of the agreement" between McLoughlin and T.C.

**{¶ 28}** T.C. talked with M. after this incident, assured M. "it wasn't [M.'s] fault," and discussed some options in the event M. became pregnant. At a later date, T.C. also talked with M. about the facts that the first sexual encounter "wasn't a very good experience" and that McLoughlin "wanted to make it right with all of us, you know. So that we would all three I guess mutually decided to have a threesome." According to T.C., M. "was okay with it if it happened," but nothing was "arranged" at the time of the conversation.

**{¶ 29}** T.C. testified that the first "threesome" took place on another weekend visit

to her home by M. when they were watching a movie. T.C. was "not sure who started it," but she observed McLoughlin kiss M., put his mouth on M.'s vagina, put his penis in M.'s mouth, and then put his penis inside her vagina. T.C. also "performed oral sex" on M., then she and M. "had sex," and they all went back to watching a movie.

{¶ 30} According to T.C., on a different visit, there was one more sexual encounter involving McLoughlin, M., and T.C. "It was pretty much exactly the same as the first time," with McLoughlin putting his mouth on M.'s vagina and putting his penis in her vagina, T.C. also performing "oral sex" on M., and then McLoughlin and T.C. "having sex"; the only difference on this occasion was that, when McLoughlin asked M. to "suck his [penis]," M. said no, and McLoughlin "respected" that.

{¶ 31} After the third encounter, M. texted T.C. that she, M., "didn't want to do anything anymore," and T.C. told her that was fine.

{¶ 32} T.C. testified that she had been "crazy about" McLoughlin since the first date he came to her apartment with a friend. McLoughlin asked T.C. to marry him after Thanksgiving 2016 and prior to his first sexual encounter with M. T.C. stated that McLoughlin's first sexual encounter with M. was in early December 2016. T.C. had told M. that "it was okay" to have a sexual relations with McLoughlin "if, you know, she felt that way about him." Drugs – cocaine, "meth," and Ritalin -- were used by T.C. and McLoughlin "during every encounter."

{¶ 33} Finally, the State introduced a recording of a telephone conversation between McLoughlin and his mother, made while he was in the Tri-County Jail. (The parties stipulated to the accuracy of the recording and the identity of the participants.) During the conversation, McLoughlin's mother asked him why he had been arrested; he

responded that "[h]e didn't know.   And it had been [T.C.'s] idea.   And that they had had a threesome with her oldest daughter."

**{¶ 34}**   First, there was ample evidence that McLoughlin was aware of M.'s age. M. testified that she had talked with McLoughlin about being in the eighth grade, and T.C. testified that she had told McLoughlin M.'s age.   This evidence, if believed by the jury, was sufficient to show that McLoughlin knew of M.'s age or at least that she was less than 16 years of age, or that he was reckless in that regard.

**{¶ 35}**   Second, the evidence regarding the timing of the offenses was consistent with the indictment.   M. and T.C. gave very consistent testimony about when the offenses occurred.   M. testified that the first sexual encounter occurred on a Saturday after Thanksgiving 2016 but before Christmas break; her testimony suggests, but does not expressly state, that it was during a weekend visit after Thanksgiving, not Thanksgiving weekend.   She stated that the second encounter was before her Christmas break from school that year, and that the third encounter occurred over her Christmas break.   She also stated that the sexual encounters lasted "[a] couple of weeks."

**{¶ 36}**   T.C. testified that M. met McLoughlin in December 2016 and that M.'s first sexual encounter with McLoughlin occurred in December 2016.   The police found McLoughlin hiding in T.C.'s apartment on January 20, 2017.

**{¶ 37}**   The indictment stated that each of the offenses occurred between December 1, 2016, and January 20, 2017.   The State presented sufficient evidence to establish this timeline.   McLoughlin contends that "there should have been prior knowledge by the State" that the date range was inaccurate insofar as it extended into 2017, because (he claims), M.'s testimony only described the events as occurring "up

until Christmas of 2016." This characterization of the evidence is inaccurate; M. testified that the third incident was "on [her] Christmas break," but she did not remember the day. M. testified that her Christmas break was "[a]bout a week" long, plus weekends. It was not unreasonable or inaccurate for the indictment to contain a portion of January in the relevant timeframe. Moreover, McLoughlin has made no argument with respect to how he was prejudiced by the dates contained in the indictment, especially considering that he was found at T.C.'s apartment on the end date, January 20, 2017.

{¶ 38} More generally, there was evidence from which the jury could have reasonably found that McLoughlin committed unlawful sexual conduct with a minor, in several forms, with M. on three separate occasions, and attempted to do so an additional time on the third occasion, when he asked her to perform fellatio and she declined.

{¶ 39} Upon review of the evidence, the jury's verdicts were supported by sufficient evidence, and they were not against the manifest weight of the evidence.

{¶ 40} The first and second assignments of error are overruled.

*Merger*

{¶ 41} In his third assignment of error, McLoughlin contends that the trial court should have merged the multiple offenses charged with respect to his second and third sexual encounters with M., because there was only one animus per encounter.

{¶ 42} Ohio's allied offense statute, R.C. 2941.25, provides that:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶ 43}** " 'As a practical matter, when determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must ask three questions when defendant's conduct supports multiple offenses: (1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation?   An affirmative answer to any of the above will permit separate convictions.   The conduct, the animus, and the import must all be considered.' " *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, quoting *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 31. The Supreme Court has further explained:

At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct.   The evidence at trial or during a plea or sentencing hearing will reveal whether the offenses have similar import. When a defendant's conduct victimizes more than one person, the harm for each person is separate and distinct, and therefore, the defendant can be convicted of multiple counts. Also, a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense.   We

therefore hold that two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable.

*Ruff* at ¶ 26.

**{¶ 44}** Courts generally hold that different forms of sexual conduct are committed separately and with a separate animus. *See State v. Jordan*, 2d Dist. Champaign No. 2016-CA-17, 2017-Ohio-5827, ¶ 10-11 (touching breasts and vaginal area were separate acts, each with a distinct significance or import, even when committed near in time); *State v. Parker*, 193 Ohio App.3d 506, 2011-Ohio-1418, 952 N.E.2d 1159, ¶ 114 (2d Dist.) (offenses involving different, distinct types of sexual activity constitute separate crimes and their merger is not required); *State v. Nicholas*, 66 Ohio St.3d 431, 435, 613 N.E.2d 225 (1993) (vaginal intercourse, cunnilingus, and digital penetration are "three separate crimes involving distinct sexual activity. * * * Since each constitutes a separate crime with a separate animus, they do not constitute allied offenses of similar import."). *Accord, e.g., State v. McSwain*, 8th Dist. Cuyahoga No. 105451, 2017-Ohio-8489, ¶ 43-44 (digital penetration, penile penetration, and oral sex were not allied offenses); *State v. J.M.*, 10th Dist. Franklin No. 14AP-621, 2015-Ohio-5574 (rape counts relating to different parts of the body do not merge); *State v. Chamberlain*, 12th Dist. Brown No. CA2013-04-004, 2014-Ohio-4619, ¶ 71 ("It is well-established that distinct, different kinds of sexual activity constitute separate offenses for sentencing purposes."); *State v. Daniels*, 9th Dist. Summit No. 26406, 2013-Ohio-358 (defendant's digital penetration of the vagina, fellatio, and vaginal intercourse with the victim were separate acts of rape for which defendant

could be separately punished).

{¶ 45} The trial court agreed with the State's argument that each separate act constituted separate identifiable conduct for which McLoughlin had a separate animus. We agree that the sexual acts were committed separately, notwithstanding that they occurred close in time. The trial court did not err in refusing to merge McLoughlin's offenses for purposes of sentencing.

{¶ 46} The third assignment of error is overruled.

***Cumulative Error***

{¶ 47} In his fourth assignment of error, McLoughlin argues that he was denied his right to a fair trial by cumulative error. The issues discussed under this assignment are not separately assigned as error.

*Voir Dire*

{¶ 48} With respect to voir dire, McLoughlin argues that he was prejudiced in that two of the potential jurors were allowed to express reasons why they questioned their ability to be impartial in the presence of the entire venire. Prospective Jurors # 11 and #42 were at issue. They responded affirmatively to a question about whether they believed, for whatever reason, that they could not "be fair and impartial in carrying out their service as a juror."

{¶ 49} Prospective Juror # 11 indicated both that she did not believe she could serve as a juror "for any reason" and that she believed that she could not be fair and impartial in carrying out her service as a juror. When questioned, she first indicated that she suffers from chronic arthritis, the pain of which varies from day to day. She also stated, "there is scientific findings that sexual offenders cannot be rehabilitated. * * * So

I don't know what would be a fair punishment we can give in a sense, you know what I mean? * * * There is an answer, but I don't think it's practiced in this country. That would be fair and impartial I believe."

{¶ 50} Following this comment, the court explained to the venire that it was not to consider punishment and would not be responsible for deciding any punishment. Juror # 11 repeated that she would "have a hard time" and "[could] only think I'm here to punish or not to punish." In response, the court acknowledged to all of the jurors that the nature of the allegations in the case was "a difficult subject for jurors to have to consider," but also stated it was important for jurors to remember that they might come before the court for some matter in the future wherein they "would want jurors that are willing to serve and were willing to set aside the difficulties."

{¶ 51} Prospective Juror # 11 then elaborated on her medical condition, stating that her "bones hurt when [she] sit[s] for long periods of time," that long periods of time in the same position are difficult, that she was "very miserable" in court at that time, and that her doctor "usually calls and excuses" (presumably for matters like jury duty), "but the nurse forgot her message to the doctor." At the end of this questioning, both parties agreed to excuse Prospective Juror # 11 because of her pain.

{¶ 52} Prospective Juror # 42 indicated in preliminary questioning of the venire that he did not think he could be fair and impartial. He stated:

I guess it's any man that would look at a minor that way. He's probably had other opportunities to pick someone older and more his age. I have a hard time keeping that separate. I have grandchildren. So to think of someone – you know, I just worry about my grandchildren. I don't think I

could be impartial.

{¶ 53} The court reminded the venire that the defendant was presumed to be innocent until the State proved all of the facts alleged, and Prospective Juror # 42 indicated that he understood. When questioned again about whether he would be "unable to set aside [his] personal feeling and judge the case solely" on the evidence presented, Prospective Juror # 42 stated that he had doubt and would have a hard time "dismissing it to be fair," but "all I can say is I can try. I can't tell you if it will be or will not. I'll just try."

{¶ 54} The jury and an alternate were seated without reaching Prospective Juror # 42. Therefore, his answers were not subject to further discussion, and he was not discussed during the court's consideration of challenges for cause or peremptory challenges.

{¶ 55} McLoughlin argues that he was prejudiced by the questioning of these prospective jurors in front of the other prospective jurors and that the court should have conducted the "impartiality inquiry" in a separate courtroom, as it did with prospective jurors who indicated that they or someone close to them had been sexually abused.

{¶ 56} "The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 72, citing *State v. Lorraine*, 66 Ohio St.3d 414, 418, 613 N.E.2d 212 (1993). Trial judges are not required to exclude all possibly controversial topics during this process. *State v. Clinton*, Ohio Sup. Ct. Slip Opinion No. 2017-Ohio-9423, __ N.E.3d __, ¶ 123, citing *State v. Wilson*, 74 Ohio St.3d 381, 387, 659 N.E.2d 292 (1996).

{¶ 57} We cannot conclude that the trial court abused its discretion in questioning

the prospective jurors about their abilities to be fair and impartial in open court. Such questions evoke a wide variety of responses, many of which are not foreseeable and/or objectionable; in order to efficiently and effectively conduct voir dire, a court may reasonably choose to hear preliminary questions and answers in the presence of the venire. Moreover, the concerns raised by Prospective Jurors # 11 and # 42 provided openings for the court to provide and/or enforce important facts for the entire venire, such as the fact that the jury does not determine punishment, the importance of each individual's willingness to serve, and the importance of basing decisions solely on the evidence presented and the court's instructions.

{¶ 58} McLoughlin was not prejudiced by the manner in which voir dire was conducted.

*References to Prior Conviction and Parole*

{¶ 59} McLoughlin argues that improper references to his prior conviction for unlawful sexual conduct with a minor and to his being on parole at the time of the offenses were allowed at trial, and that a probation officer should not have been permitted to testify about McLoughlin's prior offense or the conditions imposed through his parole. Defense counsel did not object to this testimony; therefore, we review only for plain error.

{¶ 60} In order to constitute plain error, the error must be an obvious defect in the trial proceedings, and the error must have affected substantial rights. *State v. Norris*, 2d Dist. Montgomery No. 26147, 2015-Ohio-624, ¶ 22; Crim.R. 52(B). Plain error should be noticed "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Singleton*, 2d Dist. Montgomery No. 26889,

2016-Ohio-5443, ¶ 45.

**{¶ 61}** Insofar as the jury was asked to determine, as a special finding, whether McLoughlin had a prior conviction of unlawful sexual conduct with a minor, not all references to it were improper, including the one made by the State in its opening statement. The Clerk of Courts' testimony about McLoughlin's prior conviction and the certified copy of this conviction, which was presented as an exhibit, were also proper.

**{¶ 62}** Sgt. Schmidt testified that, when he found McLoughlin "hiding" behind a water heater in T.C.'s basement, McLoughlin offered, as an explanation, that he had been drinking, that he was "on probation," and that he was not supposed to be drinking as a condition of his parole. McLoughlin told Schmidt who his probation officer was. Defense counsel repeated some of these questions about the reasons McLoughlin had been hiding during cross-examination, apparently to show that he was not hiding for any reason related to what happened to M. Because McLoughlin volunteered information about his parole status to Sgt. Schmidt as a means of explaining his suspicious behavior, because defense counsel solicited some of the same testimony from McLoughlin, and because McLoughlin's prior conviction was an element that the State was required and entitled to prove, we cannot conclude that McLoughlin suffered undue prejudice as a result of the Sgt. Schmidt's testimony.

**{¶ 63}** The parole officer testified that McLoughlin was on post-release control and was supervised out of Logan County. The parole officer also testified that he had spoken to Sgt. Schmidt on January 20, 2017; Schmidt informed the parole officer that McLoughlin "was located in a house * * * where there were some minors located inside the home" and was "possibly under the influence of alcohol." Based on this information,

the parole officer ordered McLoughlin's arrest.

**{¶ 64}** Although Sgt. Schmidt called the parole officer from the apartment, and the information he obtained from the phone call seems to have played a role in Schmidt's decision to arrest McLoughlin, it was of little, if any, relevance to McLoughlin's guilt of the charged offenses. As discussed above, the existence of a prior conviction was established through the testimony of the clerk of courts and the certified copy of the judgment entry that she provided, such that there was little, if any, reason to focus the jury's attention on McLoughlin's probation and its terms.

**{¶ 65}** However, the parole officer's testimony was very brief, and McLoughlin neither objected to his being called as a witness nor to specific aspects of his testimony. Thus, we review for plain error.

**{¶ 66}** We also note that, immediately after the parole officer's testimony, the trial court instructed the jury about the limited purpose for which his prior conviction and other acts could be considered: that this evidence was not received and could not be considered "to prove the character of the Defendant in order to show that he acted in conformity with that character." Insofar as McLoughlin's prior conviction for unlawful sexual conduct with a minor was known to the jury through evidence that was properly introduced, we cannot conclude that the parole officer's limited testimony affected McLoughlin's substantial rights, that he was unduly prejudiced by it, or that the outcome of his case would have been different if the matter had been handled differently. We find no plain error.

*Motion to Suppress*

**{¶ 67}** McLoughlin also argues that he was denied the effective assistance of

counsel because his attorney did not file a motion to suppress McLoughlin's "incriminating statements," when he was found in the basement, about drinking and being on probation; McLoughlin asserts that Schmidt "would not have known [these facts] but for the defendant-appellant's admission." McLoughlin contends that a motion to suppress, if it had been filed, "would have likely been sustained."

{¶ 68} Because Sgt. Schmidt had been given permission to search the apartment and had been told by T.C. that no one else was in the house, Schmidt approached McLoughlin with his gun drawn "for officer safety reasons." When Schmidt asked why McLoughlin was "hiding in the basement," McLoughlin explained that he did not want to be caught in a probation violation, i.e., drinking. Schmidt confirmed that McLoughlin had a prior conviction and was on parole through a LEADS search of traffic and criminal records "while speaking with him." Schmidt also learned that one of McLoughlin's previous charges was unlawful sexual conduct with a minor. Based on the record before us, we cannot find that a motion to suppress his statement likely would have been granted, that Schmidt would not otherwise have known of the prior conviction, or that Schmidt's inquiry as to why McLoughlin was in the basement violated his constitutional rights. Moreover, even if a motion to suppress had been granted, McLoughlin's prior conviction would have been known to the jury through other evidence.

{¶ 69} The cumulative error doctrine provides that a conviction may be reversed "where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial[,] even though each of numerous instances of trial court error does not individually constitute cause for reversal." *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). The doctrine of cumulative error does not apply in this case because

McLoughlin has not established multiple instances of harmless error.

**{¶ 70}** The fourth assignment of error is overruled.

**{¶ 71}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

HALL, J. and TUCKER, J., concur.

Copies mailed to:

Jane A. Napier
Regina R. Richards
Hon. Nick A. Selvaggio