[Cite as *State v. Eldridge*, 2023-Ohio-3998.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2022-CA-52 |
| | : | |
| v. | : | Trial Court Case Nos. 2022 CR 0268; |
| | : | 2022 CR 0375 |
| JOE ELDRIDGE | : | |
| | : | (Criminal Appeal from Common Pleas |
| Appellant | : | Court) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on November 3, 2023

. . . . . . . . . . .

APRIL F. CAMPBELL, Attorney for Appellant

MEGAN A. HAMMOND, Attorney for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Defendant-Appellant Joe Eldridge appeals from his felony convictions in two separate cases following a joint jury trial in the Greene County Common Pleas Court. For the following reasons, we will affirm the judgments of the trial court.

### I. Facts and Course of Proceedings

{¶ 2} On June 17, 2022, Eldridge was charged by way of indictment in Greene C.P. No. 2022 CR 0268 on one count of failure to comply with an order or signal of a police officer with a substantial risk of physical harm to persons or property, in violation of R.C. 2921.331(B), a felony of the third degree, and one count of failure to comply with an order or signal of a police officer when the operation of the motor vehicle by the offender was a proximate cause of serious physical harm to persons or property, in violation of R.C. 2921.331(B), a felony of the third degree.

{¶ 3} On August 26, 2022, Eldridge was charged by way of indictment in Greene C.P. No. 2022 CR 0375, on one count of domestic violence (two prior offenses), in violation of R.C. 2919.25(A), a felony of the third degree.   Eldridge had previously been charged for the same offense in Greene C.P. No. 2022 CR 0269 but was reindicted in Case No. 2022 CR 0375 to reflect additional prior convictions.   Following the reindictment in Case No. 2022 CR 0375, the State moved to dismiss Case No. 2022 CR 0269, and the trial court granted the motion to dismiss.

{¶ 4} Case Nos. 2022 CR 0268 and 2022 CR 0375 proceeded to trial jointly on August 29, 2022.   At trial, the State introduced the testimony of Debbie Matheson, the Executive Director of the Family Violence Prevention Center, as an expert in the dynamics of domestic violence.   She testified generally about domestic violence and explained that victims are often reluctant to prosecute domestic violence cases because they fear the unknown and their own safety.   She stated that victims do not always report the abuse right away and have a tendency to return to abusive relationships.   Once abuse happens, Matheson explained that sometimes the alleged perpetrator will attempt to win the victim

back, which allows the perpetrator to continue manipulating the victim for his (or her) benefit.

{¶ 5} Jennifer Keaton was friends with the victim, Angela C., and testified on behalf of the State. In April 2022, Keaton had known Angela for about three months, and she considered her a pretty close friend. Keaton knew Angela lived in the Hawthorne Apartments in an apartment she shared with Eldridge and a guy named "Mike." Eldridge and Angela were in a romantic relationship and shared a bedroom in the apartment.

{¶ 6} On the evening of April 27, 2022, when Keaton went over to the Hawthorn Apartment complex to pick up Angela, she saw Eldridge outside. He told her that he and Angela had got into a fight, he had put his hands on her, and that he should not have but he was sorry. Eldridge also stated that Angela would look different. Keaton did not notice any marks or injuries on Eldridge.

{¶ 7} Although it was evening when Keaton met up with Angela at the Hawthorn Apartments complex, Angela was wearing sunglasses, a hoodie, and a hat. Keaton saw that Angela was all bruised with "black and white" eyes that were swollen to the point Angela could barely see out of them. Angela also had a knot on her head and appeared scared and nervous. When she saw Angela's injuries, Keaton started to cry and gave Angela a hug. Angela, who was visibly shaking, also cried and was holding onto Keaton.

{¶ 8} Keaton had never seen Angela in that condition previously. When she had seen Angela earlier that day at 6 a.m., she had not observed any injuries. Angela also had not appeared nervous or shaking when Keaton saw her earlier. When Keaton asked Angela what had happened, Angela said that she and Eldridge had been arguing and

fighting and that Eldridge got physical.   Angela told Keaton that Eldridge "set [sic] on top of her and was hitting her."   Tr. 126.   After Angela told her what had happened, Keaton asked her if she wanted to report the situation to the police, but Angela declined, stating that "it would make it worse."   *Id.* at 128.

{¶ 9} Keaton and Angela drove to the store and then to Keaton's house, where they stayed for a couple of hours.   Although she did not want to, Keaton took Angela back to Angela's apartment because Angela wanted to go home.

{¶ 10} Keaton did not report the incident to the police at that time.   However, on April 30, 2022, Keaton and her husband took Angela to the police department to make a report.   At that time, photographs were taken of Angela's injuries.   Angela's jaw, face, and forehead were bruised and swollen.   Angela's eyes were black and blue and there was some bruising on her neck.   According to Keaton, Angela's eyes had been darker and more swollen shut on the evening of April 27th compared to the photographs taken on April 30th.

{¶ 11} On April 30, 2022, Officer Rachel Ward of the Fairborn Police Department responded to a domestic violence call and met with Keaton, Angela, and Keaton's husband.   Ward observed that Angela had two swollen, black eyes and took photographs of Angela's injuries.   She conducted no further investigation and turned the case over to a detective.

{¶ 12} Detective Travis Hunsbarger of the Fairborn Police Department was assigned to follow up on the complaint against Eldridge.   Hunsbarger spoke with both Angela and Keaton about the incident.   He had a warrant issued for Eldridge's arrest

based on the domestic violence charges.

{¶ 13} Officer Connor Mulcahy of the Fairborn Police Department testified that he was working as a uniformed officer in a marked patrol car on June 7, 2022. While working the nightshift, Mulcahy was on routine patrol on Kauffman Avenue near Powell Avenues in the City of Fairborn. The area had a bike path on one side of the road and a sidewalk on the other side of the road. It was mostly a residential area but there were a couple of gas stations nearby. The road was considered one of the busiest roads in the city.

{¶ 14} Officer Mulcahy observed a man on a motorcycle who looked back at him while driving southbound on Kauffman Avenue. Mulcahy ran the license plate of the motorcycle and identified the driver, who was not wearing a helmet, as Eldridge. After verifying that Eldridge had an active warrant out for his arrest based on the April 27, 2022 incident with Angela, Mulcahy pursued the motorcycle, which he found shortly thereafter in a McDonald's parking lot.

{¶ 15} When Officer Mulcahy saw the motorcycle, he pulled up to it, confirmed the driver was Eldridge, and turned on his cruiser's overhead lights. Eldridge was directly in front of the police cruiser at the time. As Mulcahy started to get out of his car, Eldridge picked up his feet and put them on the motorcycle. Mulcahy yelled "stop," but Eldridge took off on the motorcycle heading northbound.

{¶ 16} Officer Mulcahy notified dispatch and the other patrol units and got back in his police car to pursue Eldridge. He turned on the cruiser's siren; the overhead lights were still activated from the initial stop. Mulcahy attempted to apprehend Eldridge, but

he decided to end his pursuit after approximately half-a-mile due to the dangerousness of the circumstances. According to Mulcahy, Eldridge was accelerating rapidly on his motorcycle in an area where a lot of foot traffic was common. Based on Mulcahy's experience, motorcycles had a risk of harm to the driver, particularly as in this case where Eldridge was not wearing a helmet, was traveling at a very high rate of speed, and it was dark outside at night, close to 11:30 p.m. The area had a lot of side streets where cars or pedestrians could enter onto Kauffman Avenue, even at that time of night, including Officer Mulcahy's supervisor, who was conducting a traffic stop on that same road at that time. Eldridge did not slow down when he passed Mulcahy's supervisor, which was required by law.

{¶ 17} Officer Mulcahy testified that the speed limit along Kauffman Avenue near Powell was 35 miles per hour. He was not able to estimate how fast Eldridge was driving because Eldridge "was going way too fast." Tr. 255.

{¶ 18} Once Officer Mulcahy decided to end the pursuit, he turned off his lights and siren and began to slow down. He then saw a motorcycle's headlight facing him, which looked like a traffic crash. Less than 10 seconds after Mulcahy had turned off his lights and siren, he reactivated them. Mulcahy found Eldridge's crashed motorcycle and saw Eldridge lying in the grass. When Mulcahy went to place handcuffs on him, Eldridge complained of a painful leg injury. Eldridge was unable to walk away on his own and medics had to assist him into the ambulance to take him to the hospital.

{¶ 19} The State also presented evidence regarding recorded jail telephone calls involving Eldridge that took place on June 13, 14, and 15, 2022. In a phone call between

Eldridge and Angela on June 13, Eldridge discussed being stopped at the entrance to McDonalds when the officer "lit him up" so he "gunned it." Eldridge claimed he was going "101" right before he crashed. Eldridge described his injury as a "shattered ankle" and indicated he was in significant pain. He explained that he had pins and screws inside his foot and had had emergency surgery. Before ending the phone call, Angela told Eldridge that she loved him. Eldridge responded that he loved her with all his heart and he was going to marry her.

{¶ 20} In a phone call recorded on June 14, Eldridge told Angela that she was the one for him. They also discussed Angela's not going forward with the case in court and that there was not much anyone could do about it. Eldridge commented that "you're the victim, why would they lock the victim up?" Eldridge told Angela to "follow your heart like I told you" and said he was "sorry for everything I've ever done to you." He also told Angela that he would "make it up to you if I walk on this free." Eldridge stated that he wanted to marry Angela and would "make an honest woman" out of her.

{¶ 21} Finally, in a recorded phone call from June 15, Eldridge discussed his fleeing and eluding case with an unknown man. Eldridge stated that he may never walk again. When asked what happened, Eldridge stated that he tried to outrun the police on his motorcycle and wrecked it, which destroyed the motorcycle. Eldridge stated that he had to have emergency surgery on his foot, he had shattered his ankle, and pins and screws had been placed in his foot.

{¶ 22} Prior to the State's resting, the parties stipulated to Eldridge's prior domestic violence convictions. Eldridge did not have anyone testify on his behalf.

{¶ 23} The jury found Eldridge guilty as charged on all counts. At sentencing, the parties agreed that the two counts of failure to comply should merge, and the State elected sentencing on the failure to comply with an order or signal of a police officer when the operation of the motor vehicle by the offender was a proximate cause of serious physical harm to persons or property. The court sentenced Eldridge to 36 months in prison in Case No. 2022 CR 0268, to be served consecutively to a prison term of 36 months in Case No. 2022 CR 0375. Eldridge filed a timely notice of appeal.

## II.     Admission of Excited Utterances Evidence

{¶ 24} Eldridge's first assignment of error states:

The trial court abused its discretion when it refused to exclude the hearsay statement of the victim through a witness, both identifying Eldridge as the suspect and accusing Eldridge of committing domestic violence against her.

{¶ 25} Eldridge contends that the trial court erred in admitting certain testimony of Keaton during trial that included statements Angela had made to Keaton about her injuries. Keaton testified that on the evening of July 27, 2022, Angela told her that she and Eldridge had been arguing and fighting and that "he got physical." Tr. 125. According to Keaton, Angela said that Eldridge "hit her; set [sic] on top of her and was hitting her." *Id.* at 126. The trial court permitted this testimony over Eldridge's objection based on the excited utterance exception to the hearsay rule.

{¶ 26} Evid.R. 801(C) defines "hearsay" as "a statement, other than one made by

the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted in the statement." Hearsay is generally not admissible at trial unless permitted under specific circumstances. Evid.R. 801 and 802. An "excited utterance" is an exception to the rule against hearsay and is "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803.

{¶ 27} "For a statement to be admissible as an excited utterance, four prerequisites must be satisfied: (1) the occurrence of an event startling enough to produce a nervous excitement in the declarant; (2) a statement made while still under the stress of excitement caused by the event; (3) a statement related to the startling event; and (4) the declarant's personal observation of the startling event." *State v. Abner*, 2d Dist. Montgomery No. 20661, 2006-Ohio-4510, ¶ 69, citing *State v. Taylor*, 66 Ohio St.3d 295, 300-301, 612 N.E.2d 316 (1993).

{¶ 28} "We review a ruling on the admissibility of an alleged excited utterance for an abuse of discretion." *State v. Sibole*, 2d Dist. Clark No. 2017-CA-68, 2018-Ohio-3203, ¶ 10, citing *State v. Henley*, 2d Dist. Montgomery No. 20789, 2005-Ohio-6142, ¶ 22. "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." (Citation omitted.) *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. "Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *Id.*, citing *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14.

{¶ 29} Eldridge challenges whether the statements were made while Angela was still under the stress of excitement caused by the event. In particular, he takes issue with the unknown length of time between when the startling event occurred and the time the statements were made. While the passage of time between the statement and the startling event is relevant in determining whether the statement is an exited utterance, it is not dispositive of the issue. *State v. Hopkins*, 2018-Ohio-1864, 112 N.E.3d 98, ¶ 37 (2d Dist.), citing *Taylor* at 303. "There is no *per se* amount of time after which a statement can no longer be considered to be an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be a result of reflective thought." (Emphasis sic.) *Taylor* at 303. " '[E]ach case must be decided on its own circumstances[.] ' " *Id.*, quoting *State v. Duncan*, 53 Ohio St.2d 215, 219-220, 373 N.E.2d 1234 (1978). "Relevant factors in ascertaining whether the declarant was in a sufficient state of excitement or stress include outward indicia of [the declarant's] emotional state such as tone of voice, accompanying actions, and general demeanor." (Citations omitted.) *Osborne v. Kroger Co.*, 10th Dist. Franklin No. 02AP-1422, 2003-Ohio-4368, ¶ 46.

{¶ 30} Although the precise time of the assault is unknown, Keaton testified that she had seen Angela earlier that same day, around 6 a.m., at which time Angela did not have any of the injuries that were observed later that night. Accordingly, the incident occurred the same day as when the challenged statements were made.

{¶ 31} More importantly, however, Angela had been personally involved in a

shocking event – a physical assault – that left significant injuries to her face, head, and neck. Keaton described Angela as being scared, nervous, visibly shaking, and crying when Angela disclosed what happened to her. Further, Angela's out-of-court statements were directly related to the incident and limited to identifying her assailant and what happened during the assault she sustained. Under these circumstances, we cannot conclude that the trial court abused its discretion in admitting the statements under Evid.R. 803(2).

{¶ 32} Eldridge's first assignment of error is overruled.

### III. Cross-Examination Limitation

{¶ 33} Eldridge's second assignment of error states:

The trial court abused its discretion when it did not allow defense to question the State's essential witness about her drug problem, thereby denying Eldridge's right to confront the essential witness against him.

{¶ 34} During the cross-examination of Keaton, defense counsel inquired about the nature of Keaton's relationship with Angela. Defense counsel then asked, "Did you all do any drugs together?" Tr. 137. Before she answered, the State objected, and the parties discussed the objection at sidebar. Defense counsel alleged that Keaton used to smoke methamphetamines with Angela. The State argued that any past behavior was irrelevant unless he was asking Keaton if she was under the influence at the time the conversation between Keaton and Angela took place, which could potentially relate to her ability to accurately recall or relay events. Defense counsel argued that if Keaton used drugs, it went to her credibility. The trial court limited cross-examination to asking if

Keaton was under the influence on April 27, 2022, either in the morning when Keaton saw Angela or in the evening when Angela relayed statements to her, and on April 30, 2022, the day she took Angela to the police station.

{¶ 35} Following the sidebar, defense counsel asked Keaton if she and Angela had smoked methamphetamines around April 27 to 29. Keaton responded that they did not do methamphetamine on the night of April 27. When defense counsel asked whether they had used drugs on April 28, the State objected, and the trial court sustained the objection. Defense counsel then asked about their use of drugs on April 29. The trial court again sustained the prosecution's objection to that question. No further questions were asked regarding any drug use.

{¶ 36} Eldridge contends that the trial court should have allowed his entire line of questioning because Keaton's credibility was material to the State's case. We disagree.

{¶ 37} Cross-examination of a witness is "permitted on all relevant matters and matters affecting credibility." Evid.R. 611(B). However, the trial court "shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence[.]" Evid.R. 611(A). "[T]rial courts have wide latitude in imposing reasonable limits on the scope of cross-examination based upon concerns about harassment, prejudice, confusion of the issues, the witness's safety, or repetitive, marginally relevant interrogation." *State v. Foust*, 2d Dist. Montgomery No. 20470, 2005-Ohio-440, ¶ 14, citing *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). "The trial court has broad discretion in the admission and exclusion of evidence and unless it has clearly abused its discretion and the defendant has been materially

prejudiced thereby, [a reviewing] court should be slow to interfere." *State v. Hymore*, 9 Ohio St.2d 122, 128, 224 N.E.2d 126 (1967).

{¶ 38} As the State argued during trial, it is well-recognized that a witness' alcohol or drug use at the time of an incident could affect the witness' perception of, recollection of, or ability to describe what occurred, which could impact his or her credibility. *E.g., State v. Pillow*, 2d Dist. Greene No. 2007-CA-95, 2008-Ohio-6046, ¶ 120 ("Evidence of intoxication of a witness at the very time of the matter about which he testifies is relevant on the issue of credibility of that witness's testimony on that matter."). Evid.R. 616(B) provides that a defendant can argue a sensory or mental defect by showing that a witness had a "defect of capacity, ability, or opportunity to observe, remember, or relate," either through the examination of the witness or through the use of extrinsic evidence. "Cross-examination of a witness regarding his use of drugs or intoxication at the time of the matter about which he testifies is relevant on the issue of the credibility of his testimony on that matter." *State v. Rutledge*, 2d Dist. Montgomery No. 7830, 1983 WL 4885, *3 (Apr. 12, 1983). This is precisely why the trial court permitted Eldridge to inquire of Keaton as to whether she used drugs on the day the assault occurred, April 27, and on the day she took Angela to the police department to report the assault, April 30. When asked if she used drugs on April 27, Keaton denied it. Although permitted, Eldridge did not inquire as to Keaton's drug use on April 30. This was a proper inquiry under Evid.R. 616(B). We cannot conclude that the trial court abused its discretion by concluding that Keaton's general drug use or whether she used drugs on April 28 or 29, 2022, did not constitute permissible cross-examination under Evid.R. 616(B).

**{¶ 39}** Evid.R. 608(B) deals with the character for truthfulness of a witness. Evid.R. 608(B) provides in part that:

Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

**{¶ 40}** Thus, while a witness may be impeached under Evid.R. 803(B) by evidence that shows a general character for untruthfulness, a "witness's credibility may not be impeached with evidence of general bad moral character[.]" *State v. Anderson*, 7th Dist. Mahoning No. 03MA252, 2006-Ohio-4618, ¶ 127, citing *State v. Shields*, 15 Ohio App.3d 112, 113, 472 N.E.2d 1110 (8th Dist.1984). Moreover, "[c]riminal activities not resulting in conviction cannot ordinarily form the basis for an attack upon a witness's credibility." *State v. Skatzes*, 2d Dist. Montgomery No. 15848, 2003-Ohio-516, ¶ 183. Defense counsel's only purported purpose for asking whether Keaton used illicit drugs on April 28 or 29, 2022, was to raise general character issues concerning Keaton, i.e., if she used drugs, she was not credible. "[C]ross-examination of a witness as to *general* drug usage to show that he was a person unworthy of belief merely because he was of such character

may not be clearly probative of truthfulness in a particular case." (Emphasis sic.) *State v. Robinson*, 3d Dist. Hancock No. 5-04-12, 2004-Ohio-5346, ¶ 9. To ask generally whether Keaton used drugs was not relevant to Keaton's character for truthfulness or her ability to accurately recall the events of April 28 or April 29, 2022. We are, therefore, unable to conclude that the trial court's ruling limiting the cross-examination of Keaton as to her possible drug use outside of April 27 and 30, 2022, was unreasonable, arbitrary, or unconscionable.

**{¶ 41}** Eldridge's second assignment of error is overruled.

### IV. Manifest Weight and Sufficiency of the Evidence

**{¶ 42}** Eldridge's third and fourth assignments of error assert that his conviction for failure to comply was against the manifest weight of the evidence and not supported by sufficient evidence. Because these assignments of error are interrelated, we will address them together.

**{¶ 43}** "The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and qualitatively different." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). However, "[w]here an appellate court determines that a conviction is not against the manifest weight of the evidence, the conviction is necessarily based on legally sufficient evidence." (Citations omitted.) *State v. McLoughlin*, 2d Dist. Champaign No. 2017-CA-22, 2018-Ohio-2426, ¶ 8.

**{¶ 44}** "[A] weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." (Citation omitted.) *State v. Wilson*, 2d Dist. Montgomery No.

22581, 2009-Ohio-525, ¶ 12. When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Because the trier of fact sees and hears the witnesses at trial, we must defer to the fact finder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997). The fact that the evidence is subject to different interpretations does not render a conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances in which the evidence weighs heavily against the conviction. *Martin* at 175.

{¶ 45} Eldridge was charged with and found guilty of two counts of failure to comply with an order or signal of a police officer. In accordance with R.C. 2921.331(B), the State was required to prove that Eldridge operated a motor vehicle so as to willfully elude or flee a police officer after receiving a visible or audible signal from a police officer to bring his motor vehicle to a stop. To raise the level of the offenses to a third-degree felony, the State had to prove under count one, that the operation of the motor vehicle by Eldridge was a proximate cause of serious physical harm to persons or property and, under count two, that the operation of the motor vehicle by Eldridge caused a substantial risk of serious

physical harm to persons or property.   R.C. 2921.331(C)(5)(a)(i)-(ii).

{¶ 46} "Serious physical harm to persons" means any of the following:

(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

(b) Any physical harm that carries a substantial risk of death;

(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

(d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).

{¶ 47} "Serious physical harm to property" means any physical harm to property that does either of the following:

(a) Results in substantial loss to the value of the property or requires a substantial amount of time, effort, or money to repair or replace;

(b) Temporarily prevents the use or enjoyment of the property or substantially interferes with its use or enjoyment for an extended period of time.

R.C. 2901.01(A)(6).

{¶ 48} "Substantial risk" is defined as "a strong possibility, as contrasted with a

remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8). Simply because an offender is fortunate enough not to actually cause harm is of no consequence as the "strong possibility" that harm could occur creates culpability. *State v. Gasiorowski*, 8th Dist. Cuyahoga No. 80000, 2001 WL 1806897, *3 (Mar. 7, 2001), citing *State v. Semenchuk*, 122 Ohio App.3d 30, 701 N.E.2d 19 (8th Dist.1997).

{¶ 49} Eldridge argues that when the police officer turned off his cruiser's lights and siren, the chase ceased, and he was no longer fleeing and eluding. Eldridge contends that, prior to the officer's turning off his lights and siren, there was no substantial risk of serious physical harm to persons or property and the operation of his motorcycle was not a proximate cause of serious physical harm to persons or property because he had not yet crashed.

{¶ 50} When Officer Mulcahy attempted to stop Eldridge, Eldridge was driving a motorcycle without a helmet. He then fled from Mulcahy, who had turned on not only his overhead lights but also his audible siren. Instead of stopping, Eldridge significantly increased his speed in order to elude Mulcahy. At that time, it was approximately 11:30 p.m. on a main roadway that had lots of side streets where cars or pedestrians could enter. Officer Mulcahy was not able to estimate how fast Eldridge was driving because Eldridge "was going way too fast," but he did indicate that Eldridge was unlawfully speeding. Tr. 255-256. According to Eldridge's statements in the jail telephone calls, the officer "lit him up" so he "gunned it," and he claimed that he was going "101" right before he crashed. The posted speed limit on Kaufman Avenue was 35 miles per hour.

When Eldridge passed the police vehicle that had stopped another motorist, he neither slowed down nor used a turn signal to change lanes. Officer Mulcahy testified that in his experience, because Eldridge was traveling at a very high rate of speed on a motorcycle without a helmet, there was a significant potential for harm to Eldridge. Mulcahy also explained that, in that area, they had "had a lot of bad motorcycle crashes * * * because of speed." *Id.* at 254. Because of the potential for harm, Mulcahy decided to terminate his pursuit.

{¶ 51} Even though Officer Mulcahy turned off his cruiser's lights and siren, Eldridge was in a position where he was fleeing the police on a motorcycle without a helmet, at a high rate of speed, at night, on a main roadway. Mulcahy testified that Kauffman Avenue had a lot of side streets where people or cars could enter onto Kauffman, and Eldridge "blew by" his supervisor who had stopped another vehicle for a traffic stop. The substantial risk of serious physical harm to persons or property was established. The fact that serious physical harm to persons and property was incurred mere moments later further demonstrated that there had in fact been a "substantial risk" immediately prior to Eldridge's crash based on the circumstances. In his recorded phone calls, Eldridge discussed the severe injury to his foot, explaining that he had emergency surgery for his shattered ankle and had to have pins and screws inside his foot. He went so far as to say he may never walk again and that his motorcycle was wrecked.

{¶ 52} Furthermore, at the time he crashed his motorcycle, Eldridge claimed he was fleeing from police officers and trying to outrun them. Officer Mulcahy observed Eldridge crash within seconds of turning off his cruiser's lights and siren and immediately

turned them on again. In short, there was ample evidence that Eldridge was willfully fleeing and eluding a police officer, both immediately before and at the time of his crash, and serious physical harm ensued. Under these circumstances, the jury did not lose its way or create a manifest miscarriage of justice when it convicted Eldridge of failure to comply with an order or signal of a police officer and found that the operation of the motorcycle by Eldridge was a proximate cause of serious physical harm to persons or property and created a substantial risk of serious physical harm to persons or property. Because his convictions were not against the manifest weight of the evidence, they were necessarily supported by sufficient evidence.

{¶ 53} Eldridge's third and fourth assignments of error are overruled.

## V.    Conclusion

{¶ 54} Having overruled all of Eldridge's assignments of error, the judgments of the trial court will be affirmed.

. . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.